UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| BARBOURVILLE DIAGNOSTIC IMAGING CENTER, | ) ) ) ) | Civil No. 12-191-GFVT |
| Plaintiff, | ) ) | **MEMORANDUM OPINION** **&** |
| V. | ) ) | **ORDER** |
| PHILIPS MEDICAL SYSTEMS, INC., | ) ) ) | |
| Defendant | ) ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Before the Court is Defendant Philips Medical Systems' Motion for Summary Judgment. [R. 47.] The Defendant asks the Court to "enter a final judgment dismissing Plaintiff's breach of contract claim," and further seeks summary judgment with respect to its own breach of contract and unjust enrichment counterclaims. [R. 47-1 at 26.] For the reasons set forth below, the Defendant's motion will be GRANTED IN PART.

**I**

In 2001, Plaintiff Barbourville Diagnostic Imaging Center ("Barbourville") purchased an MRI scanner from Defendant Philips Medical Systems ("Philips"). Barbourville's original service agreement with Philips expired a few years later, although the Plaintiff indicates the parties orally contracted for repair services on several occasions in 2008 and 2009. [R. 48 at 2.] Barbourville entered into a new three-year service agreement with Philips in 2009. [*Id.*] In July 2010, however, Barbourville signed yet another service agreement with Philips. According to the Plaintiff, Barbourville "entered this new agreement because throughout the oral contract and

first written contract, the MRI equipment repeatedly malfunctioned, failed to operate properly or render appropriate diagnostic images, and remained out of service for long periods of time because of a broken or defective part that the Defendant failed to identify or repair." [*Id.*] The 2010 agreement contained "new features" not provided in previous contracts, including a "96% uptime guarantee" and "Philips Utilization Services." [R. 48 at 2.] Barbourville hoped the new agreement would "help assure that the Defendant kept the malfunctioning equipment in working condition." [*Id.*] In addition to offering this uptime guarantee, the 2010 agreement expressly provided that it "constitute[d] the entire understanding of the parties and supersede[d] all other agreements, written or oral, regarding its subject matter." [R. 35-3 at 4, ¶ 18.] The terms of this agreement also required Barbourville to pay Philips $249,300 in monthly installments over three years. [R. 35-3 at 1-2.]

Barbourville indicates that, only two days after the parties signed the 2010 agreement, Philips technician Steve Cullen properly diagnosed the defect that had previously caused the MRI to malfunction. [R. 48 at 2.] Albert Moreland, the president and majority shareholder of Barbourville, testified that "after [Cullen] got all of his stuff done and this thing was up to par, the way it should have been, that machine ran . . . without one problem." [R. 46 at 87.] Approximately one year later, Barbourville sold its "business, and the MRI, to another company." [R. 47-1 at 1.] Philips claims that, although the "Plaintiff retained for itself the proceeds of this sale, which totaled $150,000," it refused to pay the remaining $145,462.95 owed to Philips under the 2010 agreement. [*Id.*] According to Moreland, he stopped making the monthly payments because he (1) was "financially devastated" and (2) had recently come "to the conclusion . . . that Philips did not honor their contracts." [R. 46-1 at 101.]

In August 2012, Barbourville filed suit against Philips in Knox County Circuit Court,

2

seeking damages related to Philips's allegedly negligent maintenance of the MRI. [R. 1-1 at 4.] Philips thereafter removed the case to this Court pursuant to 28 U.S.C. § 1332(a). [R. 1 at 1.] In August 2013, the Court dismissed with prejudice the Plaintiff's claims against Philips for negligent repair, negligent hiring, negligent misrepresentation, and a proposed "general claim" that attempted to "assert[] any other legal theory of recovery that would justify an award of damages to the Plaintiff." [R. 16 at 6-9.] The Court further granted Barbourville leave to amend its breach of contract claims in order to satisfy the pleading requirements of Rule 12(b)(6). [R. 16 at 7-8.] Thus, the only counts to survive dismissal are Barbourville's claims regarding Philips's alleged breach of (1) oral contracts entered into in 2008 and 2009 and (2) written contracts agreed to in 2009 and 2010.

In November 2013, Philips filed counterclaims against Barbourville for breach of contract or, in the alternative, unjust enrichment. [R. 21.] After the close of discovery on October 1, 2015, Philips filed the present Motion for Summary Judgment. [R. 47.] The Defendant now seeks "summary judgment on all pending claims and counterclaims in this action." [R. 47-1 at 3.]

**II**

**A**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine dispute exists when the evidence shows "that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Put differently, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be

3

insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 252. The moving party has the initial burden of identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding*, 285 F.3d 415, 424 (6th Cir. 2002). Moreover, the movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has satisfied this burden, "the nonmoving party must go beyond the pleadings and come forward with specific facts to show there is a genuine issue for trial." *Chao*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). The nonmoving party, however, "must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Chao*, 285 F.3d at 424 (internal citations omitted).

Additionally, the trial court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact," and "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). Finally, in reviewing a motion for summary judgment, courts "must construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Browning v. Dept. of Army*, 436 F.3d 692, 695 (6th Cir. 2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 495 U.S. 574, 587 (1986)).

**B**

**i**

Before reaching the substance of Barbourville's breach of contract claims, the Court must first determine which contracts remained in effect at the time of the Plaintiff's filing. To begin,

4

Philips argues the integration clause of the 2010 agreement extinguished Barbourville's right to sue for the alleged breach of any prior contract. [R. 47-1 at 11.] Under New York law,[1] it is "well settled" that "where the parties have clearly expressed or manifested their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement." *Northville Industries Corp. v. Ft. Neck Oil Terminals Corp.*, 474 N.Y.S.2d 122, 125 (N.Y. App. Div. 2d Dept. 1984) *aff'd*, 477 N.E.2d 1102 (N.Y. 1985). Here, the 2010 agreement contained the following language:

> **18. Entire Agreement.**
>
> This agreement constitutes the **entire understanding** of the parties and **supersedes all other agreements**, **written or oral, regarding its subject matter.** No additional terms, conditions, consent, waiver, alteration or modification will be binding unless in writing and signed by Philips' authorized representative and Customer. Additional or different terms and conditions, whether stated in a purchase order or other document issued by Customer, are specifically rejected and will not apply to the transactions contemplated by this agreement. No prior proposals, statements, course of dealing, course of performance, usage or trade or industry standard will be part of this Agreement.

[R. 35-3 at 4, ¶ 18] (emphasis added). In its response to Philips's motion, Barbourville argues this language is "clearly meant to simply state that there are no additional terms or agreements included in the parties' agreement from that point forward." [R. 48 at 4.] That is flatly not what the agreement says. Instead, the contract explicitly "supersedes all other agreements, written or oral, regarding its subject matter." [R. 35-3 at 4, ¶ 18.] A contract that "supersedes all other agreements" unmistakably impacts the enforceability of prior agreements, and does not simply affect agreements from "that point forward." The contract's reference to "additional terms" merely provides a routine reminder that neither party can modify the terms of

---

[1] The parties stipulate that, per the express terms of the agreements, New York law applies to the Court's interpretation of these contracts.

the contract without the other party's consent. Moreover, the record reflects, and the parties do not dispute, that the "subject matter" of each contract was the same—both concerned the Defendant's maintenance of the MRI.

As a second basis for contesting Philips's argument, Barbourville takes great pains to distinguish the present facts from those described in the two cases cited by Philips, *Northville Indus. Corp*, 474 N.Y.S.2d 122, and *Citigifts, Inc. v. Pechnik*, 492 N.Y.S.2d 752 (N.Y. App. 1985). In *Northville* and *Citigifts*, Barbourville maintains the "plaintiff knew of the breach before entering into the new contract." [R. 48 at 4.] Although Barbourville finds this distinction meaningful, New York courts do not. The legal effect of a contract that expressly "supersedes" a prior agreement does not turn on whether the plaintiff "knew" of a past breach "before entering into the new contract"; instead, it rests on the evident "intention" of the parties "that [the] subsequent agreement supersede or substitute for an old agreement." *Northville Indus. Corp*, 474 N.Y.S.2d at 125. Courts have consistently applied this standard across myriad fact patterns, regardless of whether the plaintiff had knowledge of the defendant's existing breach. *See, e.g., N. Hill Funding of New York, LLC v. Maiden & Madison Holdings, LLC*, 911 N.Y.S.2d 694 (N.Y. Sup. Ct. 2010) (finding agreement extinguished prior contract because contract language stated new agreement "supersede[d] the provisions" of other contract); *Friedman v. Ocean Dreams, LLC*, 841 N.Y.S.2d 819 (N.Y. Sup. Ct. 2007) *aff'd*, 868 N.Y.S.2d 131 (N.Y. App. Div. 2d Dept. 2008) (recognizing that language stated new contract "supersed[ed] all prior agreements" and thus plaintiff could not bring claim arising out of past agreement); *Health-Chem Corp. v. Baker*, 915 F.2d 805, 811 (2d Cir. 1990) (citing *Citigifts, Inc. v. Pechnik,* 112 A.D.2d 832) (noting "[t]he word 'supersede' has been defined . . . to mean "set aside,' 'annul,' 'displace,' 'make void,' and 'repeal,'" and holding that "[w]hen the parties to a contract enter

into a new agreement that expressly supersedes the previous agreement, the previous agreement is extinguished, thereby reducing the remedy for breach to a suit on the new agreement."); *Wigton v. Rosenthall*, 747 F. Supp. 247, 249 (S.D.N.Y. 1990) (finding "[a] superseding agreement creates new contractual obligations between the parties and supplants any prior agreement" and thus "[t]he parties' only remedy for breach is an action based on the new agreement.").

In any event, the record indicates that Barbourville's decision to enter into the 2010 agreement resulted *precisely* from its knowledge of the Defendant's failure to repair the MRI properly—as Barbourville concedes, it agreed to the 2010 contract because it hoped the agreement's additional guarantees would "assure that the Defendant kept the malfunctioning equipment in working condition." [R. 48 at 2.] That hope came to fruition just two days after the parties agreed to the new contract, when Cullen began repairs designed to get the MRI "up to par," after which the "machine ran . . . without one problem." [R. 46-1 at 87.] This chain of events only underscores why New York law holds that superseding contracts must extinguish a plaintiff's right to sue under a previous agreement. When Barbourville first determined that Philips' service was inadequate, it opted to discharge the existing agreement and enter into a new contract—with new associated financial obligations—that provided a more robust uptime guarantee. Now, Barbourville seeks to benefit trebly from this sequence of events—not only would it like to (1) retain the benefits of the new contract, but it also wishes to (2) sue Philips under the previous agreement that it discharged in exchange for the new contract's uptime guarantee and (3) refuse to honor the financial obligations arising under this new contact on account of that prior breach. As the foregoing cases demonstrate, New York law forbids a plaintiff from engaging in such contractual gamesmanship.

**ii**

Because the 2010 agreement extinguished Barbourville's right to bring any action based on the prior contracts, the Court's only remaining task is to consider the Plaintiff's claims against Philips for breach of the 2010 agreement. The record indicates this agreement became effective on July 22, 2010. [R. 35-3 at 1.] Barbourville's Amended Complaint suggests that Philips was in breach of contract until August 2010. [R. 17 at ¶¶ 5-11.] The record fails, however, to explain fully what breach Barbourville believes Philips committed in August. In his interrogatory responses, Moreland apparently provides the only detailed allegation relating to August 2010. Specifically, he refers to "field service reports from 7/28/2009-8/5/2010," and claims "breach of contract on all field service reports due to no Philips Service personnel documenting that [he] had complained on multiple occasions about software issues" related to the MRI. [R. 38-1 at 13.] Moreland alleges that, despite these complaints, "the only comment that [he] ever received was that [] my building [] had an environmental problem." [*Id.*]

There are numerous problems with this claim. First, the record directly contradicts Moreland's suggestion that Philips ignored his complaints in August 2010. In its response to the Defendant's motion, Barbourville indicates the parties signed the 2010 agreement on July 26, 2010. Barbourville goes on to say that, only "[t]wo days after [the Plaintiff] signed the 2010 agreement, Philips technician Steve Cullen appeared to work on Plaintiff's MRI" and "immediately diagnosed the issue." [R. 48 at 2.] The Plaintiff later repeats that "Steve Cullen showed up on July 28, 2010" and "immediate[ly] diagnos[ed]" the "simple problem" with the MRI. Likewise, in his deposition, Moreland expressly states that the MRI began "working to specifications" after "Mr. Cullen finally came to my facility and got this thing up to working." [R. 48-1 at 31.] He goes on to emphasizes that, "after [Cullen] got all of his stuff done and this

8

thing was up to par," the MRI ran "without one problem" until "November or December 2014," three years after he had already sold the machine to another company.[2] [*Id.* at 87.] Barbourville elsewhere refers to Cullen as "extremely competent" [R. 48 at 7] and suggests that he "diagnosed the problem within 5 minutes of talking to [Moreland]." [R. 38-1 at 8.] In the face of this overwhelming evidence, the record altogether fails to support Moreland's claim that Philips ignored his complaints in August 2010.

Even accepting that Barbourville could provide facts indicating that Philips did not service the MRI properly in August, the Plaintiff waived its right to bring this claim by continuing to accept performance on the contract for over a year. Under New York law, "a contracting party may orally waive enforcement of a contract term notwithstanding a provision to the contrary in the agreement," and "[s]uch waiver may be evinced by words or conduct, including partial performance." *Matthew Adam Properties, Inc. v. The United H. of Prayer for All People of the Church on the Rock of the Apostolic Faith*, 6 N.Y.S.3d 233, 235 (N.Y. App. Div. 1st Dept. 2015); *see also Madison Ave. Leasehold, LLC v. Madison Bentley Associates LLC*, 811 N.Y.S.2d 47, 52 (N.Y. App. Div. 1st Dept. 2006) *aff'd*, 861 N.E.2d 69 (N.Y. 2006) ("Out of simple fairness, a party that has repeatedly waived a condition of performance . . . is required to give notice that its waiver has been withdrawn before demanding strict compliance with the condition."); *Tibbetts Contracting Corp v. O & E Contracting Co.*, 206 N.E.2d 340, 346, 409 (N.Y. 1965) (finding plaintiff's breach of contract claim "was waived in any event through the acquiescence of [the plaintiff] and its acceptance of the work done by [the defendant] under the subcontract," adding that "[t]he assertion of a repudiation of the contract is nullified by a subsequent acceptance of benefits growing out of the contract.").

---

[2] Moreland relatedly states that the MRI stopped working in 2014 only because "a part . . . went out" and "it was so expensive that [the new company] just didn't replace it." [R. 46-1 at 87.]

Beginning in August 2010, Barbourville made monthly installment payments to Philips—without any apparent objection to the service provided by the Defendant—every month until October 2011, the date at which Moreland sold the business to another company. This course of conduct likely resulted from Barbourville's satisfaction with Cullen's "extremely competent" service, which led to the MRI running "without one problem" until the date of sale. [R. 47 at 7, R. 38-1 at 8.] In any case, the record demonstrates that Barbourville (1) continued to accept performance on the contract for approximately 14 months after signing the new agreement and (2) failed to make any claim regarding the Defendant's alleged breach of contract throughout this period.[3] Barbourville nevertheless maintains that its continued performance did not constitute waiver because Philips "lulled Plaintiff into acceptance by providing extremely competent service in Steve Cullen." [R. 48 at 7.] That is not a legal argument. Rather, it merely explains the circumstances motivating Barbourville's waiver—because the Plaintiff had no objection to the Defendant's service, it continued to accept performance on the contract until Moreland sold the business in October 2011.

Finally, Philips provides a fourth basis for entering summary judgment. [R. 47-1 at 14.] The disputed agreement expressly states that the services provided by Philips are offered "AS IS" and "NO WARRANTY OF MERCHANTABILITY OF FITNESS FOR A PARTICULAR PURPOSE APPLIES" to those services. [R. 35-3 at 4.] New York law holds that, when a "contract specifically disclaims the existence of any such warranties or representations, an action for breach of contract cannot be maintained." *Smith v. Fitzsimmons*, 584 N.Y.S.2d 692, 694 (N.Y. App. 1992). Barbourville insists, without citation to any legal authority, that this warranty

---

[3] The Court adds that Barbourville's acceptance of Philips' performance throughout the life of their business relationship, without any allegation of breach of contract, would similarly bar their claims under the superseded agreements.

10

does not bar its claims because "[t]o interpret this provision in the *service* contract to relieve the Defendant of its implied obligation to provide competent *service* is to effectively render the contract worthless." [R. 48 at 6.] (emphasis in original). But the service agreement was not worthless merely because it contained a disclaimer, just as a product is not worthless simply because it contains a similar disclaimer. The contract bound Philips to service the MRI, but qualified that the service provided would be offered on an as-is basis. New York courts have enforced such disclaimers in service contracts. In *Scott v. Bell A. Corp.,* 726 N.Y.S.2d 60 (N.Y. App. Div. 1st Dept. 2001), for example, the court held a plaintiff could not bring an action arising from a service provider's failure to solve internet connection problems in part because of "Service Agreement provisions that the service would be provided on an 'as is' or 'as available' basis." *Id.* at 63-64. The existence of this disclaimer, then, would also bar Barbourville's suit.

### iii

In light of the foregoing, the Court finds that Barbourville's claims for breach of contract fail as a matter of law. The only remaining issue, then, concerns the Defendant's counterclaims for breach of contract or, in the alternative, unjust enrichment. These allegations are closely related to the discussion above, and the Court may resolve them easily. Under New York law, a claim for breach of contract requires the movant to show: (1) the formation of a contract; (2) performance by one party; (3) failure to perform by the other party; and (4) resulting damages. *N.Y. State Workers' compensation Bd. V. SGRisk, LLC*, 983 N.Y.S.2d 642 (N.Y. App. Div. 2014). Barbourville concedes that the 2010 agreement required it to make monthly installment payments to Philips over the course of three years, and likewise admits that Moreland stopped making these payments around October 2011. [R. 46-1 at 97.] The only defense offered by Barbourville is that the Defendant's counterclaim "fails at the second element" of this test, which

11

requires evidence of the movant's performance. [R. 48 at 9.] For all the reasons explained above, however, the record strongly supports the conclusion that Philips performed its obligations under the 2010 agreement. In the absence of any other defense offered by Barbourville, and in view of the Plaintiff's explicit admission that it failed to comply with the terms of the agreement, the Court must find in favor of Philips.

Because the Court concludes that Barbourville breached the 2010 agreement, it need not reach the Defendant's separate allegation of unjust enrichment. Both of these claims seek damages arising out of Barbourville's breach of the same contract, and thus any claim for unjust enrichment is duplicative of Philips' breach of contract claim. *See Bettan v. Geico Gen. Ins. Co.*, 745 N.Y.S.2d 545, 546 (N.Y. App. Div. 2d Dept. 2002).

### iv

Finally, the Court must address the Defendant's proposed calculation of damages. Philips "requests that the Court award Philips as damages for its breach of contract claim against Plaintiff the liquidated sum of $145,426.95; interest at the rate of 18% per annum, accruing on the principal balance of $145,426.95 since May 3, 2012; and Philips' reasonable attorney fees and costs associated with its efforts to collect said past due balance from Plaintiff." [R. 47-1 at 23.] A summary judgment motion is typically not an appropriate vehicle for requesting a specific damages amount. The Court will direct the parties to discuss the proper damages calculation in this case, and will only enter this discussion if the parties cannot agree upon a specific amount.

### III

For the reasons outlined above, the Court finds that Barbourville's breach of contract claims fail as a matter of law. Further, the Court concludes that Barbourville plainly breached

the terms of its 2010 agreement with Philips.  Accordingly, and the Court being otherwise sufficiently advised, the Defendant's Motion for Summary Judgment is **GRANTED IN PART**, and the Court **HEREBY ORDERS** as follows:

1. Defendant's motion for summary judgment with respect to (1) Plaintiff's breach of contract claims and (2) its own breach of contract counterclaim is **GRANTED**;

2. Defendant's motion for summary judgment with respect to its unjust enrichment counterclaim is **DENIED**;

3. The Court **DIRECTS** the parties to enter a proposed agreed order within (60) days of the entry of this Order containing an agreed upon calculation of damages.  If the parties cannot reach an agreement within this time period, the Court further **DIRECTS** the parties to file a status report prior to the expiration of the deadline; and

4. Because no triable issues remain, the parties' Joint Motion for Continuance of Trial and Pretrial Conference **[R. 50]** is **DENIED AS MOOT.**

This 19th day of February, 2016.

Gregory F. Van Tatenhove
United States District Judge